# ROE *v.* HANSON.

PATENTS; INTERFERENCE; REDUCTION TO PRACTICE; DILIGENCE.

Where the junior party to an interference involving the shifting device for the saws of a gang-edger, conceived and disclosed his invention in November, 1898, was engaged in the preparation of drawings from that time, at such odd times as he could spare from his business, until April or May, 1899, when he showed and explained them to his opponent, and completed the device and embodied it in a full-size machine adapted for practical use, before August 1, 1899, and then tested it, but did not use it in a mill and commercially test it until March, 1900, it was *held,* reversing the Commissioner of Patents, that he was entitled to an award of priority of invention over the senior party, who conceived the invention in April, 1899, and reduced to practice in July, 1899, and to whom a patent was granted seven days after the filing of his opponent's application for a patent.

No. 194. Patent Appeals. Submitted March 12, 1902. Decided April 1, 1902.

HEARING on an appeal from the decision of the Commissioner of Patents in an interference proceeding.

*Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. E. Wilkinson, Mr. S. T. Fisher* and *Mr. Bruce Cornwall* for the appellant.

*Mr. William W. Dodge* and *Mr. Thomas B. Hardin* for the appellee.

Mr. Justice MORRIS delivered the opinion of the Court:

This is an appeal from the Commissioner of Patents in an interference case, wherein the subject-matter of controversy

is the question of priority of invention of an improvement in machines for sawing timber, which is described in four issues formulated in the Patent Office, as follows:

" 1. In a gang-edger, the combination of a saw-arbor, a series of saws mounted thereon, a series of slides of like form and dimensions having their outer ends at an angle to the body of the slide, and connections between said slides and the saws.

" 2. In a gang-edger, the combination of a saw-arbor, a series of saws mounted thereon, a series of slides of like form and dimensions having their outer ends at an angle to the body of the slide, an arm connected to each of said slides, a guide for said slides and arms, and connections between said slides and the saws.

" 3. In a gang-edger, the combination of a saw-arbor, a series of saws mounted thereon, guides or ways adjacent to said arbor, a series of slides of like form and dimensions, mounted on said ways, said slides having a straight body portion with their outer ends bent at an angle thereto; an arm extending from each of the slides at an angle to the straight portion and in a direction opposite to that of the bent portion of the slides; a guide for said slides and arms, and connections between said slides and the saws.

" 4. In a gang-edger, the combination of a saw-arbor, a series of saws mounted thereon, guides or ways, a series of slides of like form mounted thereon, said slides having their outer ends bent at an angle substantially as described, arms extending from the under face of the slides to one of the guides, means for holding the slides in their adjusted position, and connections between said slides and the saws."

A gang-edger is a gang or combination of circular saws for splitting and edging boards; or, as it is defined in the Century Dictionary, it is " a machine having from three to six circular saws on a common mandrel, capable of being so adjusted as to split wide planks into boards or scantlings of the width required."

It is a machine well known and widely used in the lumber regions of the Western States of our Union. In the issues

above recited, which are taken from the claims of the application of the appellant Alpheus E. Roe, a complete gang-edger is described; but the subject-matter of the controversy between the parties, and the subject of invention here, is greatly more limited. It is merely the shifting device for adjusting the circular saws into their desired positions. This adjustment is effected by the use of hand-levers.

The appellant Alpheus E. Roe, who is the junior applicant, alleges in his preliminary statement that he conceived the invention, first made drawings of it, and disclosed it to others, on or about November 1, 1898; that on or about May, 1899, he showed and explained these drawings to his opponent, the appellee Dempsy B. Hanson; that he first embodied his invention in a full-sized machine which was completed and operated before August 1, 1899, and which was at that time examined by Hanson; that, on March 19, 1900, this machine was successfully operated and used in the city of New Whatcom, in the State of Washington, where the appellant resided; that he has since continued to use the same; and that he has also manufactured another machine for use in the sawmills of the company by which he was employed, the Bellingham Bay Improvement Company. He filed his application for a patent on January 2, 1900.

The appellee Dempsy B. Hanson in his preliminary statement alleges that he conceived the invention on or about March 25, 1899; that he communicated it to others about April 1, 1899; that he made drawings or sketches of it about April 15, 1899, or rather that he caused such drawings or sketches to be made by a draftsman for him; that the invention was commenced to be embodied in full-sized operative form about May 1, 1899, and completed in the early part of July, 1899; and that other machines have since that time been in public use.

Hanson's application for patent was filed in the Patent Office on September 6, 1899, and letters patent were issued to him on January 9, 1900, seven days after the filing of Roe's application, and probably in ignorance of the filing

of that application. At all events, although a patentee, he cannot, as against Roe, be entitled to any special advantage from his patent. He is, however, the senior applicant; and, as such, he is entitled to have the burden of proof placed upon his opponent Roe. This was the relative position in which they were placed by the Patent Office.

Upon the testimony and the record made for themselves by the parties, the examiner of interferences and the board of examiners-in-chief held that the appellant Roe was entitled to judgment of priority of invention. But upon appeal to the Commissioner of Patents, the assistant Commissioner, who sat in his place, reversed the decision of the board, and awarded judgment of priority of invention to the appellee Hanson. By all three of the tribunals of the office it was held that Roe was the first to conceive the invention, but second to Hanson in his reduction to practice. The decision, therefore, turned upon the question of the due diligence of Roe; and in this regard the examiner of interferences and the board of examiners held in his favor, and the assistant Commissioner against him.

From the decision of the assistant Commissioner the applicant Roe has appealed to this court.

That the appellant Roe was the first to conceive the invention in controversy may be assumed as the result of the testimony in the case. It is so held by all the tribunals of the Patent Office, and is not very seriously controverted on behalf of the appellee Hanson. We deem it unnecessary, therefore, to examine the testimony so far as it relates to this point. The conception and disclosure are shown to have occurred in November, 1898.

The appellee Hanson's conception and disclosure are not claimed to have occurred until about April 1, 1899, five months after the disclosure of the invention by Roe. Undoubtedly, therefore, in the matter of conception of the invention he was anticipated by the latter. The difficulty in the case is as to the question of reduction to practice, and as to the diligence of Roe, if it should appear that Hanson was the first to reduce to practice. If there were no

actual reduction to practice by either party before September 6, 1899, the date of the filing of Hanson's application, the latter would be entitled to priority of first constructive reduction to practice. But there is proof tending to show actual reduction to practice by both parties before that date.

Both parties were evidently working at the invention during the same period of time, the spring and summer of 1899. Hanson was undoubtedly the more diligent about this time; although there may have been a special motive for his activity, if the attempt on the part of Roe to show that Hanson derived the idea from disclosure to him by Roe about May 1, 1898, be regarded as successfully shown by the testimony. On this point, however, it is unnecessary to express an opinion.

It seems that about the end of April, 1899, Hanson communicated his idea to the Vulcan Iron Works, a company which constructed machines of this general character, and that drawings were made for him by a draftsman in the employment of the company. Thereupon during the months of May, June, and July, a machine embodying the invention was built by that company at its factory, in the city of Seattle, in the State of Washington, which was sold on July 14, 1899, to the Rock Creek Lumber Company, and thereafter used by this latter company. Hanson at this time had no specially engrossing occupation; while Roe, who was a mechanical engineer in the service of a company known as the Bellingham Bay Improvement Company, with its headquarters at New Whatcom, in the same State, was an extremely busy man, and could only give his attention to the invention at odd moments when his time was not demanded by the service of his company. After his conception and disclosure of the invention in November of 1898, it is shown that he worked diligently enough in the preparation of drawings, which he finished in April or May of 1899; and thereupon that he commenced forthwith the construction of a machine embodying the invention, which was finished in August of 1899. He was occupied at the time in the restoration of a mill for his company which had been de-

stroyed in June of the previous year. He first constructed a small mill, and thereafter a larger one. The gang-edger, which he had procured to be finished in August he was desirous to place in the first or smaller of the two mills, which was finished soon afterward; but the officers of the company preferred to have their old gang-edger repaired and used in this mill. The gang-edger with the appellant's shifting device was placed in the larger mill subsequently completed and was first operated in that mill in March of 1900. This was the first commercial test of it; but it had already been operated in such manner as to show its practicability, and it was and remained in condition adapted for practical operation.

Under these circumstances we cannot hold that there was any want of diligence on the part of the appellant. His device was complete and embodied in a full-sized machine adapted for practical application in August of 1899. For the failure to test it by putting it forthwith into practical commercial use, there is sufficient reason shown. It was tested in fact at the time and shown to be operative; and when it was finally put to the test of actual commercial use, it was shown that there was nothing wanting to its practicability. We think that in this regard this case falls within the principle of the case of *Mason* v. *Hepburn,* 13 App. D. C. 86; *Lindemeyr* v. *Hoffman,* 18 App. D. C. 1.

The examiner of interferences and the board of examiners-in-chief are not clear that the constrction of Roe's machine in August of 1899, without actual test of it by commercial use, was reduction to practice; and the Commissioner in great measure basing his opinion upon the theory that Roe's reduction to practice was not earlier than the filing of his application on January 2, 1900, holds that there was too great delay and want of due diligence on his part. We are of opinion that the construction of his machine in August of 1899, was actual reduction to practice by him, that the delay in using that machine commercially and thereby testing it by actual use was not unreasonable

under the circumstances, and that there was no want of due diligence on his part between his conception and disclosure in November of 1898 and his actual reduction of the invention to practice in August of 1899. And being of this opinion we must hold, in opposition to the decision of the assistant Commissioner, that judgment of priority of invention should be awarded to the appellant Alpheus E. Roe.

The clerk of this court will certify this opinion and the proceedings in this court in the premises to the Commissioner of Patents according to law.                    *Reversed.*